United States District Court
Southern District of Texas
**ENTERED**
May 19, 2025
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BUNGE S.A., | § § § | |
| Plaintiff, | § | |
| v. | § § | CIVIL ACTION NO. 25-1339 |
| XCOAL ENERGY AND RESOURCES, *et al.*, | § § § | |
| Defendants. | § § § | |

**MEMORANDUM AND OPINION**

This dispute involves 80,000 metric tons of coal shipped from Virginia to China under a March 2024 time charter party and subsequent sub-charter agreement. Tariffs imposed in early February 2025 made the shipment cost more than anticipated. The parties, two of several companies involved in the shipment, disagree over which entity is liable for the increase.

The issue before this court is narrow: whether the plaintiff and charterer, Bunge S.A., has asserted a valid prima facie admiralty claim against the defendants, Xcoal Energy and Resources and Xcoal Energy and Resources LLC, supporting the attachment of Xcoal's bank account as security for a New York arbitration. Based on the pleadings, the record, the briefs, oral argument, and the applicable law, the court concludes that Bunge has made its prima facie admiralty claim. Xcoal's motion to vacate is denied, except that the court reduces Bunge's claim for security to $2,094,848. The reasons for these rulings are below.

## I.    Background

In March 2024, Bunge contracted with Maple Leaf Bulk Carriers Limited to lease the "MV MAPLE WISDOM." (Docket Entry No. 1 at ¶ 7). The parties executed a time charter party[1] for a 26- to 30-month lease starting between May 30, 2024, and September 15, 2024. (*Id.*). Bunge then sub-chartered the vessel to Xcoal "for one voyage from Norfolk, Virginia to a discharge port in China for carriage of approximately 80,000 metric tons of bulk coal." (*Id.* at ¶ 8); *see also* (Docket Entry No. 1-1) (Sub-Charter Agreement). The Sub-Charter Agreement includes the following clause on "[i]nitial freight payment": "100% freight and any undisputed load port demurrage due latest before breaking bulk at the discharge port." (Docket Entry No. 1-1 at 6, Cl. 30(A)(1)).

In December 2024, 79,650 metric tons of coal were loaded on the *MAPLE WISDOM* in Norfolk. (Docket Entry No. 1 at ¶¶ 10–11). Later that month, Bunge sent a $2,532,031.60 invoice for the coal shipment to Xcoal, through Xcoal's broker. (*Id.* at ¶ 12); (Docket Entry No. 24-2).

According to Bunge's verified complaint, the original discharge port was Tianjin. (Docket Entry No. 1 at ¶ 12). An email from Xcoal's broker to Bunge in January 2025 states that there was "still no firm decision" on the final discharge port, and that Xcoal anticipated paying the invoice closer to the estimated arrival date of February 9, 2025. (Docket Entry No. 24-2 at 33). Between January 20 and February 6, Xcoal changed the discharge port several times. (*Id.* at 16–32). Bunge continued to ask about the payment status. (*Id.* at 16–20).

On February 6, 2025, Xcoal named Zhanjiang as the final discharge port. (*Id.* at 17). Bunge responded that the *MAPLE WISDOM* was scheduled to arrive in Zhanjiang on February 8,

---

[1] A "time charter party" is a contract under which "the charterer pays the owner based on the time period the vessel is used." *Saint John Marine Co. v. United States*, 92 F.3d 39, 41 n.1 (2d Cir. 1996).

2025; issued a revised invoice; and again demanded payment, citing the freight-payment clause in the Sub-Charter Agreement. (*Id.* at 16). Bunge warned that if the revised invoice was not paid by February 7, 2025, the master of the *MAPLE WISDOM* "will be instructed to keep the vessel drifting outside of the Chinese territorial sea." (*Id.*). The *MAPLE WISDOM* remained offshore from February 8, 2025, until March 3, 2025, when Xcoal paid Bunge $2,835,994.40. (Docket Entry No. 1 at ¶¶ 17–18). That payment represented the freight costs along with demurrage costs accrued because of the delay, minus "certain commissions." (*Id.* at ¶ 18); (Docket Entry No. 24 at 11).

While the *MAPLE WISDOM* was offshore and Bunge was awaiting payment, China imposed an additional 15% tariff on coal imported from the United States. (Docket Entry No. 1 at ¶ 13). The cargo receivers, Jiangsu Shagan International Trade Co., Ltd., arrested the *MAPLE WISDOM* when it arrived at Zhanjiang to obtain security for the 15% additional tariff. (*Id.* at ¶ 19). On March 7, 2025, the Guangzhou Maritime Court of the People's Republic of China issued the arrest order and gave Jiangsu 30 days to file a lawsuit or apply for arbitration. (Docket Entry No. 18-3 at 4).

The parties agree that security of $2,480,896 was provided and the *MAPLE WISDOM* was released, but it is not clear what entity paid the security. The record includes a Letter of Undertaking from Gard P. & I. (Bermuda) Ltd. to Maple Leaf Bulk Carriers Limited for security of $2,480,896 in relation to claims brought by Jiangsu for delays in the *MAPLE WISDOM*'s arrival. (Docket Entry No. 24-6). Bunge contends that the security provided by Gard was "for liability due from Bunge." *See* (Docket Entry No. 24 at 11–12). Xcoal agrees that "Gard[] provided Bunge with [protection and indemnity] coverage for the *Maple Wisdom* charter." (Docket Entry No. 26 at 10) (citing the Gard Letter of Undertaking). But Xcoal argues that the Gard Letter of

3

Undertaking "was <u>not</u> for the release of the Vessel from arrest," but rather was "security for Maple Leaf Bulk Carrier's indemnity and breach of [the] Time Charter against Bunge." (*Id.* at 12).

Bunge asserts that it is "funding" the $2,480,896 security paid for the *MAPLE WISDOM*'s release. (Docket Entry No. 1 at ¶ 20). Bunge demands that Xcoal pay that security amount and other damages resulting from Xcoal's delayed payment. *See* (*id.*). The other damages are $282,200 for hire[2] accrued under the Time Charter while the *MAPLE WISDOM* was arrested; $10,200 for fuel costs during the same period; and $66,400 for an additional four days of hire when the *MAPLE WISDOM* "was not employed because the laycan for its next fixture needed to be extended by four days." (*Id.*).

In total, Bunge alleges that Xcoal's failure to timely pay the freight and demurrage charges caused Bunge more than $3,000,000 in damages, including interest and costs. (*Id.* at ¶¶ 21–22). The Sub-Charter Agreement provides for arbitration in New York. (Docket Entry No. 1-1 at 20, Cl. 54). As security for the arbitration claim, Bunge sought attachment and garnishment of Xcoal's accounts at PNC Bank, N.A., which has multiple branches in this district. (Docket Entry No. 1 at ¶ 31). Because Xcoal could not be found within this district, Bunge moved under Rule B of the Supplemental Rules for Admiralty and Maritime Claims for an order authorizing issuance and service of process of attachment and garnishment. (Docket Entry No. 2). This court granted the motion and issued the order, which was served on PNC Bank. (Docket Entry Nos. 9, 10, 14).

After making a restricted appearance under Rule E(8) of the Supplemental Rules for Admiralty and Maritime Claims, (Docket Entry No. 8), Xcoal moved on an expedited basis to vacate the Order for Writ of Maritime Attachment and Garnishment. (Docket Entry Nos. 18, 19).

---

[2] "Payment for use of a vessel under a time charter is called 'hire.'" *Saint John Marine Co.*, 92 F.3d at 41 n.1.

4

This court amended the attachment order for the limited purpose of excluding funds held in a Health Reimbursement Account that Xcoal maintains with PNC Bank, and set an expedited briefing schedule on the motion to vacate.  (Docket Entry Nos. 22, 31).  The court held a hearing on the motion to vacate on May 9, 2025.

## II.    The Legal Standard

Under Supplemental Rule B of the Federal Rules of Civil Procedure,

> [i]f a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process.

FED. R. CIV. P. SUPP. R. B(1)(a).  In addition to meeting Rule B's filing, notice, and service requirements, a plaintiff must show that: "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006) (footnote omitted), *abrogated on other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009); *see also Naftomar Shipping & Trading Co. v. KMA Int'l S.A.*, No. CIV.A. V-11-2, 2011 WL 888951, at *2 (S.D. Tex. Mar. 10, 2011).  If the plaintiff satisfies the Rule B requirements, "the court must enter an order authorizing the attachment, which the plaintiff may then serve on any persons in possession of the defendant's property located within the district." *Aqua Stoli Shipping Ltd.*, 460 F.3d at 438.

Under Rule E(4)(f), "any person claiming an interest" in property that has been arrested or attached "shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted."  FED. R. CIV. P. SUPP. R.

E(4)(f). "At the Rule E(4)(f) hearing stage, the burden rests with the plaintiff to show that the requirements of Supplemental Rules B and E have been satisfied." *Knox v. Hornbeck Offshore Servs., LLC*, No. 3:19-CV-181, 2019 WL 3202296, at *2 (S.D. Tex. July 16, 2019).

"[C]ourts have disagreed as to the proper standard for determining whether a plaintiff has a valid prima facie admiralty claim for purposes of a motion to vacate under Rule E." *Naftomar Shipping & Trading Co.*, 2011 WL 888951, at *2 (citing examples). "Specifically, there is some debate as to whether the prima facie standard is purely a pleading standard, or whether it also incorporates an evidentiary requirement that there be 'reasonable grounds' for believing that the conditions for attachment exist." *Id.* (quoting *Emeraldian Ltd. P'ship v. Wellmix Shipping Ltd.*, No. 08cv2991 (RJH), 2009 WL 3076094, at *3 (S.D.N.Y., Sept. 28, 2009)). "Courts have compared the showing required in a 'reasonable grounds' analysis to the more familiar standard of probable cause." *Id.* (alteration adopted) (quoting reference omitted).

## III.    Analysis

### A.    The Attachment

Xcoal challenges the attachment on the basis that Bunge has failed to assert a valid prima facie admiralty claim against Xcoal. Under either the pleading standard or the more stringent "reasonable grounds" standard, Xcoal's argument fails.

The verified complaint states a facially valid claim for breach of a maritime contract, and the record provides reasonable grounds supporting that claim. Bunge alleges that Xcoal breached the Sub-Charter Agreement, a contract concerning the shipment of coal on a maritime vessel. The claim sounds in admiralty and invokes this court's admiralty jurisdiction. *See Exmar Shipping N.V. v. Polar Shipping, S.A.*, No. 06CV12991 (HB), 2008 WL 3992290, at *3 (S.D.N.Y. Aug. 27,

2008) ("[C]laims for breach of a charter party contract are classic valid prima facie admiralty claims.").

The Sub-Charter Agreement obligated Xcoal to pay "100% freight and any undisputed load port demurrage . . . latest before breaking bulk at the discharge port." (Docket Entry No. 1-1 at 6, Cl. 30(A)(1)). Bunge interprets that provision as setting "an absolute latest payment time of prior to commencement of discharge operations." (Docket Entry No. 24 at 14). Under Bunge's interpretation, failure to pay "prior to discharge and without delaying the voyage, including its discharge," is a breach of the Sub-Charter Agreement. (*Id.*). That is a reasonable way to construe the contractual language. Xcoal proposes that the language means that the only limit on when it must pay is any time before discharge. (Docket Entry No. 18 at 10, 24–25). This interpretation would allow Xcoal to delay payment indefinitely even if that caused an indefinite delay in discharge. Bunge's interpretation is reasonable. *Cf. Naftomar Shipping and Trading Co.*, 2011 WL 888951, at *3 (a court's role under Rule E(4)(f) is not "to definitively resolve the dispute between the parties," but to "make a preliminary determination whether reasonable grounds exist for the arrest" (quoting reference omitted)).

Bunge has submitted evidence that (1) Bunge performed its obligations under the Sub-Charter Agreement by transporting the coal on the *MAPLE WISDOM*; (2) the *MAPLE WISDOM* was ready to discharge at the final discharge port on February 8, 2025; (3) Xcoal did not pay the freight charge until March 3, 2025; and (4) the *MAPLE WISDOM* remained offshore between February 8, 2025, and March 3, 2025, because Xcoal had not paid. (Docket Entry Nos. 24-2, 24-3, 24-4). Xcoal does not provide contrary evidence. These facts, undisputed at this stage of litigation, establish reasonable grounds to find that Xcoal breached the Sub-Charter Agreement, as reasonably interpreted by Bunge. Bunge asserts that, because of Xcoal's breach, Bunge incurred

costs associated with securing the *MAPLE WISDOM*'s release, hire and fuel costs during the period

of arrest, and hire costs during the period between arrest and release. (Docket Entry No. 1 at ¶ 20).

This is a classic breach of contract claim.[3]

Xcoal's arguments for vacating the attachment rest on its assertion that "Bunge is actually

seeking indemnity from Xcoal for the claims, costs and expenses arising out of the Guangzhou

Maritime Court proceeding." *See, e.g.*, (Docket Entry No. 26 at 17). Xcoal spends many pages

discussing Jiangsu's claims under Chinese law, the apparently ongoing litigation in the Guangzhou

Maritime Court, and the indemnity agreements among the parties. Xcoal also repeatedly

emphasizes that there has been no final judgment or settlement in the Guangzhou case.

None of that affects this court's conclusion, as detailed above, that Bunge has asserted a

prima facie admiralty claim against Xcoal based on a breach of the Sub-Charter Agreement. The

fact that actual damages are contingent does not convert a contract claim into an indemnity claim.

*See Oldendorff Carriers GMBH & Co. KG v. Sidor C.A.*, No. 08 CV 5446 (RPP), 2010 WL

334926, at *1 (S.D.N.Y. Jan. 29, 2010) (the plaintiff asserted a contract claim, not a contingent

indemnity claim, even though the damages were contingent on an arbitration panel finding the

plaintiff liable to the vessel's owner). Bunge alleged Xcoal's breaches at the outset of this case,

and the complaint does not discuss indemnity. As Xcoal acknowledges, the Sub-Charter

Agreement does not include any indemnification language. Bunge's claim is not based on a breach

of an indemnity obligation; it is based on Xcoal's failure to timely pay, in violation of the freight-

---

[3] Relying on *Lykes Lines Ltd. v. M/V BBC SEALAND*, 398 F.3d 319 (5th Cir. 2005), Xcoal argues that
Bunge "should not be entitled to any relief" because Bunge failed to notify Jiangsu about a "possessory lien
for freight over the cargo" that Bunge "appears to have asserted" while waiting for payment, instead of
proceeding to the discharge port as scheduled. (Docket Entry No. 18 at 22–24). That argument may go to
mitigation or a potential defense to liability, but it does not undermine the court's conclusion that Bunge
has made a prima facie claim for breach of the Sub-Charter Agreement.

payment clause.[4]  Bunge reasonably argues that it is liable for the security posted in China, and

even if it is not, Bunge has alleged other actual damages resulting from Xcoal's breach.  "[W]hile

the precise measure of damages may be contingent, liability is not contingent," meaning Bunge's

claim for breach of the Sub-Charter Agreement is ripe.  *See id.* at *1.

Xcoal relies heavily on two cases: *Pacific Gulf Shipping Co. v. Adamastos Shipping &*

*Trading S.A.*, 4:19-CV-727, 2019 WL 13043041 (S.D. Tex. March 13, 2019), and *Sanko*

*Steamship Co. v. China National Chartering Corp.*, 536 F. Supp. 2d 362 (S.D.N.Y. 2008).  These

cases are inapposite.  As a preliminary issue, both cases apply English law, but the Sub-Charter

Agreement states: "U.S. Maritime Law will govern any dispute under this Charter Party, and to

the extent that such body of law needs to be supplemented, by the laws of the state of New York."

(Docket Entry No. 1-1 at 20, Cl. 54).[5]  More importantly, in both *Pacific Gulf Shipping Co.* and

*Sanco Steamship Co.*, the claim was clearly one for indemnity.  *See Pacific Gulf Shipping Co.*,

2019 WL 13043041, at *2 ("Plaintiff's claim is one that Plaintiff concedes arises from an

indemnity right."); *Sanko Steamship Co.*, 536 F. Supp. 2d at 364–65 (the relevant claim arose

under a contractual clause that "determines apportionment of liability for cargo claims").  Bunge

disputes that its claim is one for indemnity and, as detailed above, the pleadings, agreements, and

context suggest that it is not.

Because Bunge has asserted a valid prima facie admiralty claim against Xcoal based on a

breach of the Sub-Charter Agreement, the attachment is maintained.

---

[4] Bunge also argues that Xcoal breached the implied covenant of good faith and fair dealing.

[5] Xcoal makes several assertions that other contracts between companies involved in the broader dispute are governed, or "likely" governed, by English law.  *See, e.g.*, (Docket Entry No. 26 at 10) (asserting that the Time Charter between Maple Leaf Bulk Shipping and Bunge "is likely subject to English law and arbitration as is common in the shipping industry").  Those contracts do not govern the parties or dispute in this case.  The relevant choice-of-law provision is the one included in the Sub-Charter Agreement.

B.      The Amount of Security

A court may weigh equitable considerations, including the reasonableness of a plaintiff's claimed damages, when evaluating whether good cause exists to reduce security. *Transportes Navieros y Terrestres S.A. de C.V. v. Fairmount Heavy Transp., N.V.*, 572 F.3d 96, 111 (2d Cir. 2009); *see also Shakit v. M/V Forum Trader*, 14 F.3d 5, 8 (5th Cir. 1993) (a district court's order setting a $150,000 release bond for a $6 million claim was "an exercise of the district court's discretion to value the plaintiffs' claims").

This court issued an attachment for the amount of Bunge's claimed damages: $3,689,696. (Docket Entry Nos. 9, 10).  According to the complaint, that amount represents the letter of undertaking posted for the *MAPLE WISDOM*'s release ($2,480,896); the hire and fuel costs incurred by Bunge during the period of the *MAPLE WISDOM*'s arrest ($292,400); an additional four days of hire attributable to the delay ($66,400); and the estimated costs incurred and interest accrued during a two-year arbitration in New York ($850,000).  (Docket Entry No. 1 at ¶¶ 20, 22).

Xcoal asks this court to reduce the security to $500,000—the amount of Bunge's expenses without the letter of undertaking ($358,800, *see* (*id.* at ¶ 20)) plus a reasonable allocation of fees for a New York arbitration ($141,200[6]).  (Docket Entry No. 18 at 29).  Bunge responds that $850,000 is a reasonable estimate of its costs and interest through the resolution of this case, given the complicated nature of the dispute and the 9% statutory interest rate in New York.  (Docket Entry No. 24 at 23–24).  Bunge also argues that it is entitled to security covering the letter of undertaking, along with its other expenses.

---

[6] This number is calculated by taking Xcoal's total ($500,000) minus Bunge's expenses without the letter of undertaking ($358,800).

There are good reasons for this court to exercise its equitable powers to reduce the security in this case. A more than $3 million security for a claim that may last multiple years could severely harm Xcoal's business. There is uncertainty as to when, if ever, Bunge will be liable for the more than $2 million letter of undertaking posted for the *MAPLE WISDOM*, particularly given the presence of other entities and indemnity agreements. Bunge claims that it is "funding" the security posted in China, but there is no evidence of that other than the letter of undertaking. This uncertainty does not undercut the viability of Bunge's admiralty claim, as detailed above, but it counsels in favor of reducing the amount of security. On the other hand, Xcoal has not contested that it intentionally withheld payment to Bunge. Regardless of whether that was within Xcoal's contractual rights, Xcoal's actions—as established at this stage of litigation—clearly caused the *MAPLE WISDOM*'s delayed arrival in China and the expensive mess that followed.

The court finds that the security should include Bunge's hire and fuel expenses incurred as a result of the *MAPLE WISDOM*'s delayed arrival in China ($358,800). Given the uncertainty surrounding the payment of and liability for the letter of undertaking, the court finds that the attachment against Xcoal should cover half the security posted for the *MAPLE WISDOM*'s release ($1,240,448). Lastly, the court finds that a reasonable estimate of costs and interest is the midway point between the parties' proposals ($495,600). The security is reduced to the sum of those three amounts: $2,094,848.[7]

---

[7] The court has already exercised its discretion under the equitable vacatur doctrine to exclude Health Reimbursement Account funds from the attachment. (Docket Entry Nos. 22, 31). Xcoal asked the court to vacate the entire attachment under its equitable powers. (Docket Entry No. 18 at 27). That request is denied. As detailed herein, equitable factors warrant a reduction in the amount of security, not vacatur.

11

**IV.    Conclusion**

Because Bunge has asserted a prima facie admiralty claim, Xcoal's motion to vacate is denied.  The attachment is maintained, but the amount of security is reduced to $2,094,848.


SIGNED on May 19, 2025, at Houston, Texas.


Lee H. Rosenthal
Senior United States District Judge